UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| GLENN ZACCARIA, | : | |
| | : | |
| Plaintiff, | : | Hon. Dennis M. Cavanaugh |
| | : | |
| v. | : | **OPINION** |
| | : | |
| JO ANNE B. BARNHART, COMMISSIONER OF SOCIAL SECURITY, | : | Civil Action No.05-CV-3886(DMC) |
| | : | |
| Defendant. | : | |

DENNIS M. CAVANAUGH, U.S.D.J.

This matter comes before the Court upon an application by Glenn Zaccaria ("Plaintiff") to overturn the final determination of the Commissioner of Social Security (the "Commissioner"), denying Plaintiff's request for Disability Insurance Benefits ("DIB"). Oral argument was not heard pursuant to Rule 78 of the Federal Rules of Civil Procedure. The Court has jurisdiction to review this matter pursuant to 42 U.S.C. §405(g) and 1383(c)(3). For the foregoing reasons, the final decision of the Commissioner is **affirmed**.

**I. Background**

Plaintiff lives in Union City, New Jersey. He neither drives, nor owns a car due to a shooting pain he experiences in his leg. (R. at 22) Plaintiff is only physically capable of driving for fifteen to twenty minute periods. (R. at 33). Plaintiff is married with three children and currently lives in his mother-in-law's two-family house. (R. at 34). Plaintiff graduated from high school and was later certified by a culinary institute. (R. at 34). In Plaintiff's applications for DIB, he claims he has been disabled and unable to work since December 1, 1990.

### A. Procedural History

Plaintiff filed an application for DIB on October 25, 2001, alleging disability since December 1, 1990, due to a back injury, compression of discs, bone spurs, degenerating tissue, limited range of mobility of his back, stiffness, muscle spasms, locking of the joints, high blood pressure, double hernia, poor blood circulation, numbness of extremities, migraines, stomach ulcers, acid reflux, diarrhea, constipation, heart palpitations, shortness of breath, dizziness, light headedness, fractured wrist, left shoulder surgery, right shoulder dislocated, mental depression, boredom, anxiety, stress, panic or anxiety attacks, guilt, fear, low self-esteem, agitation, nervousness, feelings of hopelessness, feelings of insecurity, mood swings, poor concentration, reduced energy levels, sleep disorder, nightmares, and frustration. (R. at 107-09). Plaintiff's application was initially denied and denied again upon reconsideration. (R. at 81-91). Plaintiff applied for a hearing before the Administrative Law Judge ("ALJ"), which was held on June 30, 2004, before Judge Joel H. Friedman. On December 23, 2004, the ALJ issued a decision denying Plaintiff's application. (R. at 11-26). Plaintiff appealed to the Appeals Counsel, which affirmed the ALJ's decision on June 1, 2005. (R. at 4-6). Plaintiff now asks this Court to review the Commissioner's final decision.

### B. Factual History

#### 1. Medical Records Relating to Plaintiff's Disability Claim

On June 19, 1990, Dr. Schultz, Plaintiff's physician, referred him to Valley Hospital after Plaintiff complained of back pain for over one and a half years. (R. at 16). An MRI of Plaintiff's back showed a herniated disc at L4-5 and other bulging discs. Id. On July 17, 1990, Plaintiff returned to Valley Hospital for a second epidural injection. (R. at 16). On August 3, 1990,

Plaintiff was readmitted to Valley Hospital. (Id.) An MRI showed herniations at L4-5, and L5-S1. (Id.) Plaintiff then underwent a myelogram CT scan, which confirmed the findings of the MRI of the L4-5 and the L5-S1 herniations and as a result Plaintiff was prescribed Percocet. (Id.)

On February 6, 1992, Plaintiff made an emergency visit to Valley Hospital for a dislocated left shoulder. Plaintiff was then given Toradol, and underwent a closed reduction procedure for his left shoulder. Once that was complete, Plaintiff was given an arm immobilizer and discharged. (R. at 17). Plaintiff again dislocated his shoulder on March 6, 1992, for which he had an x-ray that revealed anterior dislocation. (Id.) Plaintiff was admitted to Barnert Hospital on March 20,1992, and diagnosed with recurrent dislocations of the left shoulder. (Id.)

On April 8, 1992, Plaintiff was admitted to the emergency room at Valley Hospital after smoking cocaine and complaining of dizziness and palpitations. (Id.) During his visit to the emergency room Plaintiff reported his shoulder surgery, but failed to mention his back or shoulder pains. (Id.) Plaintiff was discharged after his heart rate decreased with the instructions to stop using cocaine. (Id.)

Plaintiff was readmitted to the emergency room on June 4, 1992, after reporting episodes of irregular heartbeat and light-headedness. (Id.) His blood pressure was 130/80. (R. at 18). Plaintiff reported his previous shoulder surgery and the fact that he had been on blood pressure medication. (Id.) Plaintiff did not mention his prior history of drug use, and Dr. Z. Fainsilber reported no acute stress. (Id.) Plaintiff was given Verapamil Sr 180 for his blood pressure. (R. at 18).

Plaintiff was again admitted to the emergency room on January 27, 1995, due to a throbbing headache. (R. at 19). A CT scan of his head was negative. (R. at 18). Plaintiff was

given Fiorcet and discharged in stable condition with no acute stress. (Id.) Plaintiff reported being self employed at this time. (Id.)

Treatment records from Dr. Shultz's office, dated from January 1990 to December 1995, indicate Plaintiff complained about his shoulder and knee after a motorcycle accident in Mexico on January 15, 1990. (Id.) At the accident, Plaintiff suffered injuries to his left shoulder and left knee. At his first visit Plaintiff reported a long history of back pain dating back to 1998. (Id.) The initial report showed that Plaintiff only experienced pain along the anterior aspect of his left shoulder, and mild joint effusion and medial joint line tenderness in his left knee. The report indicated that there were no fractures or dislocations. (Id.) Dr. Shultz made an assessment of internal derangement of Plaintiff's left knee, and a probable anterior dislocation of Plaintiff's left shoulder. (Id.) Dr. Shultz prescribed Plaintiff Anaprox, Percocet, a left knee brace, and a shoulder immobilizer. (Id.)

Plaintiff returned to Dr. Shultz's office on February 5, 1990, and reported his knee was no longer swollen. (R. at 18). Dr. Shultz noted that the pain in Plaintiff's back and shoulder had improved. On June 4, 1990, Plaintiff returned to Dr. Shultz's office complaining of lower back pain. Dr. Shultz diagnosed Plaintiff with long stemming lower back pain. (R. at 18). Dr. Shultz referred Plaintiff to Dr. William Thimmel. (R. at 18).

On June 8, 2000, Plaintiff underwent an MRI which disclosed a disc herniation at the L4-5 region, along with disc degeneration at the L5-S1 level. Plaintiff was then sent for an epidural steroid injection and ten shots were administered. (R. at 19). On June 23, 1990, Plaintiff returned to Dr. Shultz's office and reported feeling "looser" since the epidural injection, however Plaintiff still complained of pain, but not in the same area as his disc herniation. (Id.) Plaintiff

was then sent for a second epidrual injection, along with aqua therapy.  (Id.)

On September 10, 1990, Plaintiff returned to Dr. Shultz's office for a follow up visit for his back surgery.  At this time, Dr. Shultz noted Plaintiff was ten days past L4-5 and L5-S1 right sided discectomy.  (Id.)  Plaintiff did complain of tightness in his right leg and some slight numbness in his right foot. (Id.)  Plaintiff was scheduled to return, but missed appointments on October 3, 1990, October 31, 1990, and November 3, 1990. (Id.)

On February 25, 1991, Plaintiff returned to Dr. Shultz's office complaining of right thigh and hip injuries suffered while playing football. (Id.)  Dr. Shultz reported that Plaintiff had full range of motion in the hip and knees. (Id.)  Dr. Shultz noted that Plaintiff experienced pain when he performed straight leg raises.  (Id.)  Dr. Shultz stated that he had the impression that Plaintiff had tendonitis of the hip flexors and right quadriceps muscle.  (Id.)  Plaintiff was given Anaprox. (Id.)

On April 22, 1991, Plaintiff returned to Dr. Shultz's office with complaints of tightness in his lower back, and discomfort in his right buttock.  (R. at 18).  Plaintiff's right fifth finger was causing discomfort at the DIP joint but did not lack motion.  (Id.)  An x-ray of the finger was taken, which revealed only slight hyperextension deformity at DIP joint.  (R. at 19).  Plaintiff was given Equagesic and instructed to apply tape to the right finger.  (Id.)

Plaintiff returned to Dr. Shultz's office on May 30, 1991, and was prescribed Naprosyn 500mg, twice a day with no refills.  (Id.)  On July 10, 1991, Dr. Shultz gave Plaintiff Elavil to help him sleep and to calm him. (R. at 20).  Plaintiff was then referred to Dr. Scham for consultation and treatment. (Id.)  On August 8, 1991, Plaintiff requested a prescription for a urinary track infection, but Dr. Shultz refused to refill the prescription. (Id.).

On February 6, 1992, Plaintiff underwent a follow-up examination with Dr. Shultz for his left shoulder surgery. (Id.)  Dr. Shultz placed Plaintiff's shoulder in an immobilizer for 3 weeks. (Id.)  On March 9, 1992, Dr. Shultz noted Plaintiff had dislocated his shoulder on March 6, 1992, while getting out of bed.  (Id.)  The left shoulder immobilizer was reinstated and Plaintiff was instructed to refrain from doing heavy work for at least eight weeks. (Id.)

On March 20, 1992, Plaintiff had surgery to repair his left shoulder. (Id.)  Plaintiff was performing well in physical therapy, but was not allowed to return to the weight room until the middle of May.  (Id.). On July 8, 1992, Plaintiff returned to Dr. Shultz's office complaining of lower back pain and left shoulder pain, but the examination failed to reveal any instability.  (Id.)  Dr. Shultz instructed Plaintiff to return to physical therapy.  (Id.)

On October 29, 1992, Plaintiff returned to Dr. Shultz's complaining of pain centralized in the small of his back that radiated into his groin and anterior thighs.  (R. at 19).  Plaintiff had an x-ray, which failed to show any new findings. (R. at 20).  Plaintiff was placed on a four day course of tapering Dacaron and sent back to Dr. Thimmel.  (Id.)  Dr. Shultz also renewed Plaintiff's prescription for Anaprox.  (Id.)

Nearly three years later, Plaintiff returned to Dr. Shultz's office on December 28, 1995. At this time, Plaintiff reported that he slipped on ice two days earlier and had an abduction external rotation injury to his left shoulder and a left wrist injury.  (R. at 21).  The x-ray conducted did not show an acute fracture. (Id.)  Dr. Shultz diagnosed Plaintiff with contusions to his left shoulder and wrist.  (R. at 22).  Since Plaintiff had peptic ulcer disease, Dr. Shultz advised him not to take any anti-inflammatory medicines. (R. at 20).

On November 14, 2001, Dr. Maurice F. Deraney reported that he had treated Plaintiff on

6

a "very variable basis" until July 2, 1997. (R. at 21). Dr. Deraney reported that Plaintiff did not have any limitations. (Id.)

On April 22, 2002, Dr. Alan M. Leff opined Plaintiff was completely disabled and could not work. (Id.) Dr. Leff noted Plaintiff had lumbar laminectomy done about eleven years prior and that Plaintiff suffered from chronic intractable back pain with bilateral back pain and chronic radiculopathy to the legs. (R. at 21). Dr. Leff also found Plaintiff was only able to walk short distances due to pain and locking of his right hip and right knee, and could only sit or stand for twenty minutes. (Id.) The condition was said to be permanent, and his prognosis was poor. (R. at 22).

Plaintiff last sought a medical consultation from the New Jersey Disability Determination Services. They determined that as of Plaintiff's last insured date, Plaintiff's conditions were not defined as "severe" under the Regulations. (R. at 21).

### 2. Plaintiff's Testimony

Plaintiff claims to have been disabled since 1990. (R. at 35). Plaintiff's day consists of a combination of sitting, standing, and lying down. Plaintiff believes his pain medication interferes with his mental ability. (R. at 35-36). Plaintiff stated that since his surgery he can only walk about two blocks. (R. at 36). Plaintiff attributes his 1991 pick-up football injury to his inactivity prior to playing. (Id.)

When Plaintiff visited the hospital in 1992, he stated that he worked for Versatile Vending and listed himself as self employed. (R. at 39). However, Plaintiff testified that Versatile Vending was his brother's company and he never really worked there. (Id.) Plaintiff says that he would just tell people he worked at Versatile Vending because he was embarrassed

by his unemployment. (Id.) Plaintiff said his job really just consisted of making a few return phone calls for his brother. (Id.) Plaintiff's role in his brother's company was what he was referring to when he stated on his disability form that he owned a company from 1992 until 1995. (R. at 40). From 1998 until 2000, Plaintiff was a silent owner in a body care products line. (R. at 41). Plaintiff used his IRA money to become a silent owner. (Id.) The line of body care products was eventually disbanded. (Id.) Plaintiff currently receives no income. (R. at 43). The last full-time job Plaintiff held consisted of driving a van and lifting heavy boxes. (R. at 62). The injury in 1991 marked the end of Plaintiff's full time employment to date. (Id.)

Plaintiff is currently taking Percocet, Oxycodone, and Elavil, and receiving treatment from Dr. Leff. (R. at 44, 50). Plaintiff claims he still suffers from heart palpitations. (R. at 60). Plaintiff's daily routine consists of sitting and lying on the couch while watching his children. (R. at 67).

### 3. The Decision of the ALJ

After recounting and analyzing the above facts, the ALJ determined Plaintiff was not disabled within the meaning of the Act and therefore denied Plaintiff's application for DIB. (R. at 81). Specifically, the ALJ found that there was insufficient evidence from which to conclude Plaintiff's condition was disabling on any date through September 30, 1995. (R. at 81).

## II. Discussion

### A. Standard of Review

A claimant is entitled to benefits under the Act only if he satisfies all of the relevant requirements of the statute. To establish a valid claim for DIB, a claimant must meet the insured status requirements of 42 U.S.C. §423(c) and the income and resource limitations of 42 U.S.C.

§1382(a) and §1382(b), respectively.  Finally and essentially, the claimant must demonstrate that he was disabled within the meaning of the Act.

## B. Disability Analysis

Under the Act, disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months…" 42 U.S.C. §423(d)(1)(A); <u>see</u>, 42 U.S.C. §1382c(a)(3)(A).  Physical or mental impairments are those that "result from anatomical, physiological or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. §423(d)(3); U.S.C. §1382c(a)(3)(A).  Furthermore, an individual "shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy…"  42 U.S.C. §423(d)(2)(A).

Social Security regulations provide a five-step, sequential evaluation procedure to determine whether a claimant is disabled.  20 C.F.R. §404.1520.  First, the Commissioner must inquire whether the claimant is currently engaged in substantial gainful activity. 20 C.F.R. §404.1520(a)(4)(i).  If the claimant is found to be currently engaged in substantial gainful activity, he will not be determined to be disabled, without consideration of his medical condition. 20 C.F.R. §404.1520(b).  Second, if a claimant is not engaged in substantial gainful activity, the Commissioner must decide whether the claimant suffers from a severe impairment.  20 C.F.R. §404.1520(a)(4)(ii).  If the impairment is not severe, the claimant will not be found disabled.  20

C.F.R. §404.1520(c). Third, if the claimant is found to be suffering from a severe impairment, the Commissioner must decide whether the impairment is equivalent or exceeds in severity one of the impairments listed in Appendix I of the regulations. 20 C.F.R. §404.1520(a)(4)(iii). If the impairment is listed or is the equivalent to a listed impairment, the Commissioner must find the claimant to be disabled without consideration of the facts. 20 C.F.R. §404.1520(d). Fourth, if the impairment is not listed, the Commissioner must consider whether the claimant has sufficient residual functional capacity to perform his past work. 20 C.F.R. §404.1520(a)(4)(iv). Residual functional capacity is defined as what the claimant "can still do despite [his] limitations." 20 C.F.R. §404.1520(a)(1). If a claimant has the residual functional capacity to meet the physical and mental demands of his past work, the Commissioner must determine he is not disabled. 20 C.F.R. §404.1520(f). Finally, if the claimant cannot perform any past relevant work, the Commissioner must determine, on the basis of the claimant's age, education, work experience, and residual functional capacity, whether he can perform any other work. 20 C.F.R. §404.1520(a)(4)(v). If he cannot, the Commissioner will find him disabled. 20 C.F.R. §404.1520(g).

The claimant bears the initial burden of proving that his impairment prevents him from returning to past relevant work. Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 118 (3d Cir. 2000). If a claimant satisfies the first four steps, then the burden shifts to the Commissioner to prove the existence of work in significant numbers in the national economy that the claimant could perform. Id.

### C. Scope of Review

A reviewing court must uphold the Commissioner's factual findings if they are supported

by substantial evidence. 42 U.S.C. § § 405(g), 1383 (c)(3); Knepp v. Apfel, 204 F.3d 78, 83 (3d Cir. 2000). Substantial evidence means "more than a mere scintilla." Richard v. Perales, 402 U.S. 389, 401 (1971); (quoting, Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). "It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Perales, 402 U.S. at 401; (quoting, Consol. Edison, 305 U.S. at 299). However, substantial evidence "does not mean a large or considerable amount of evidence…" Pierce v. Underwood, 487 U.S. 552, 565 (1988). Substantial evidence may be "less than a preponderance." Stunkard v Sec'y of Health & Human Servs., 841 F.2d 57, 59 (3d Cir. 1988). Some types of evidence will not be "substantial." For example:

> [a] single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence -
> particularly certain types of evidence (e.g., that offered by treating physicians) - or if it really constitutes not evidence but mere conclusion.

Wallace v. Sec'y of Health and Human Servs., 722 F.2d 1150, 1153 (3d Cir. 1983); (quoting, Kent v. Schweiker, 710 F.2d 110, 114. (3d Cir. 1983)).

"The substantial evidence standard allows a court to review a decision of an ALJ, yet avoid interference with the administrative responsibilities of the Commissioner." Claussen v. Chater, 950 F. Supp. 1287, 1292 (D.N.J. 1996); (citing Stewart v. Sec'y of Health, Educ. & Welfare, 714 F.2d 387, 290 (3d. Cir. 1983)). The standard avoids "deference to inferences drawn from the facts if they, in turn, are supported by substantial evidence." Schaudeck v. Comm'r of Soc. Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999). "The inquiry is not whether the reviewing court would have made the same determination, but, rather, whether the Commissioner's conclusion was reasonable." Schonewolf v. Callahan, 972 F. Supp. 277, 284 (D.N.J. 19997);

(citing, Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988)).  Therefore, a court may not "set the Commissioner's decision aside if it is supported by substantial evidence, even if [the reviewing court] would have decided the factual inquiry differently."  Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999).

The reviewing court has a duty to review the evidence in its totality.  Daring v. Heckler, 727 F.2d 67, 70 (3d. Cir. 1984). In order to do so, "a court must 'take into account whatever in the record fairly detracts from its weight.'"  Schonewolf, 972 F. Supp. At 284; (quoting, Willibanks v. Sec'y of Health & Human Services., 847 F.2d 301, 303 (6th Cir. 1988)) (internal citation omitted).  The Commissioner has a corresponding duty to facilitate the court's review: "[w]here the [Commissioner] is faced with conflicting evidence, he must adequately explain in the record his reasons for rejecting or discrediting competent evidence."  Ogden v. Bowen, 677 F. Supp. 273, 278 (M.D. Pa. 1987); (citing, Brewster v. Heckler, 786 F.2d 581, 584-86 (3d. cir. 1986)).  As the Third Circuit has held, access to the Commissioner's reasoning is essential to a meaningful court review:

> [U]nless the [Commissioner] has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision it supported by substantial evidence approaches an abdication of the court's "duty to scrutinize the record as a whole to determine whether the conclusions reached are rational."

Gober v. Matthews, 574 F.2d 772, 776 (3d Cir. 1978); (quoting, Arnold v. Sec'y of Health, Educ. & Welfare, 567 F.2d 258, 259 (4th Cir. 1977) (internal citation omitted)). Nevertheless, a court is not "empowered to weigh the evidence or substitute its conclusions for those of the fact-finder." Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992); (citing, Early v. Heckler, 743 F.2d 1002, 1007 (3d Cir. 1984)).

### D. Analysis

Plaintiff contends the ALJ erred as a matter of law by failing to give adequate weight to the evidence submitted by his treating and examining physicians. In addition, Plaintiff argues that substantial evidence exists in the record to support a finding of disability pursuant to 42 U.S.C. 405 (g) and 1832. (Pl.'s Br. at 4). For the reasons set forth below, this Court disagrees with Plaintiff and affirms the ALJ's decision.

**1. The ALJ Gave Proper Weight to the Medical Evidence in Making Its Determination**

Plaintiff argues the ALJ ignored substantial evidence in arriving at the conclusion that Plaintiff's shoulder, back, and heart conditions were not severe enough to warrant disability. (Pl.'s Br. at 9-11). Upon reviewing the ALJ's decision and examining the record, this Court finds substantial evidence supporting the ALJ's findings. The record shows the ALJ reviewed the aggregate medical and non-medical evidence available and properly concluded Plaintiff's conditions did not show Plaintiff was disabled. (R. at 89-91).

Plaintiff's medical records most notably cite a surgical laminectomy and microdisectomy at L4-5 and L5-S1 in August of 1990, and a closed reduction procedure on his shoulder in February of 1992. (R. at 169-179). The ALJ properly found that the limitations at the time Plaintiff was last insured were not severe enough to warrant disability. The medical records following the laminectomy and microdisectomy show Plaintiff's procedures were uneventful and his postoperative course was benign. Plaintiff was out of bed the day after the procedures and remained neurologically intact throughout the procedures and his recovery. (R. at 169). Plaintiff's medical records also indicate that the closed reduction procedure performed on his

shoulder resulted in an "excellent repair" and the neurovascular status of his hand was intact. (R. at 190-191). Finally, when Plaintiff re-injured his shoulder in February of 1993, the x-rays failed to show any fractures and Plaintiff was diagnosed with a contusion. (R. at 121). Upon the termination of Plaintiff's insurance, Plaintiff had continuously and unnecessarily failed to seek treatment for his back.

For an impairment to qualify as "severe," it must "significantly limit" an individual's ability to perform work-related activities. 20 C.F.R. § 404.1521(a). The plaintiff has the burden of producing sufficient evidence of disability. Without sufficient evidence, the ALJ does not have the means to make an accurate assessment of a plaintiff's abilities. In this case, the Court finds the ALJ did not err in concluding Plaintiff did not carry his burden by failing to produced substantial evidence to warrant a claim of disability. Plaintiff's claim of disability is unsupported. Plaintiff's medical records indicate previous impairments of his back and shoulder for which he has fully recovered. Since 1993, the record is void of Plaintiff receiving treatments for any ailments. Furthermore, during that time between 1993 and 1995, Plaintiff admitted he was employed with both his brother's vending business and self employed with his own body products line. (R. at 40).

A treating physician's opinion on the nature and severity of an individual's impairment is entitled to controlling weight only if it is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. §404.1527(d)(2). In the present case, the findings and assessments of Dr. Schultz remain uncontested. The ALJ and the medical staff called upon to review Plaintiff's record do not challenge Dr. Schultz's findings. The ALJ properly found that, in light

14

of Plaintiff's medical records, Plaintiff was not disabled as of September 30, 1995.

### III. Conclusion

For the reasons stated above, the Commissioner's determination that the Plaintiff was not disabled is affirmed.


Date:   August 21, 2006
Orig:   Clerk's Office
cc:     All parties
        File

                            S/ Dennis M. Cavanaugh
                            DENNIS M. CAVANAUGH, U.S.D.J.